## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Michael Claxton, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Univision Communications, Inc., | |
| Defendant. | |

Plaintiff Michael Claxton ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Univision Communications, Inc. ("Univision" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on his personal knowledge.

### NATURE OF THE ACTION

1.      Defendant Univision is one of the largest Spanish media conglomerates and video content providers in the United States. Defendant owns and operates several online and mobile streaming applications, including www.tv.univision.com (the "Website"). Unbeknownst to Plaintiff and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties. By doing so, Defendant violates the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

3.      This Court has personal jurisdiction over Defendant because it conducts and transacts business in the state of New York, contracts with vendors to operate its Website within the state of New York, and provides services, including its Website, within the state of New York. Furthermore, this Court has personal jurisdiction over Defendant because its Website collected and disseminated Plaintiff's personally identifiable information giving rise to this lawsuit in this District, and the conduct giving rise to this action arises out of and relates to that business.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## PARTIES

5.      Plaintiff Michael Claxton is a citizen of New York, who resides in New York, New York. Mr. Claxton has long had a Website account and used the Website to watch pre-recorded entertainment-related videos. Most recently, in or about December of 2023, prior to the filing of this lawsuit, Mr. Claxton browsed the Website on his computer using his Chrome and

Safari web-browsers and viewed pre-recorded videos on the Website. Mr. Claxton was in New York when he visited the website and logged into the Website using his Verizon FIOS TV Provider credentials in order to access the Website's restricted pre-recorded videos. Pursuant to the systematic process described herein, Defendant caused Mr. Claxton's video consumption to be sent along with his personally identifiable information ("PII") to unauthorized third parties— including Innovid and Google—without his knowledge or consent each time he requested and viewed the Website's videos.

6.     Using the information acquired through the disclosure and interception of Mr. Claxton's user data, Innovid and Google were able to analyze and track Mr. Claxton's activity across the Website, target Mr. Claxton with relevant advertising, and assist Defendant with revenue generation by factoring Mr. Claxton's user data into its marketing and advertisement activities.

7.     Mr. Claxton never consented, agreed, nor otherwise permitted Defendant to disclose his PII and viewing information to third parties and certainly did not do so for purposes violative of the VPPA. Likewise, Defendant never gave Mr. Claxton the opportunity to prevent the disclosure to and interception of his PII by third parties.

8.     Defendant Univision Communications, Inc., is a Delaware corporation with its principal place of business located in Teaneck, NJ.

## GENERAL ALLEGATIONS

### *History and Overview of the VPPA*

9.     The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which

then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

10.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

11.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

4

***Defendant is a Video Tape Service Provider***

12.     Defendant owns and operates the largest Spanish-language TV and streaming platform in the United States "Univision's portfolio of television networks, consisting of Univision, UniMás, Galavisión and TUDN, delivered 62% of the primetime viewing on Spanish-language television in the U.S. among adults 18-49, up from 58% compared to 2020, and marked the highest audience share since 2014."[1] Relevant here, Defendant's Website attracts approximately 20 million unique visitors per month, making it the most visited Spanish-language website among U.S. Hispanics.[2] Aside from providing news stories, the Website hosts and delivers thousands of pre-recorded Spanish TV shows and sports videos. After offering a free limited preview, Defendant requires its users to create an account by registering through their TV Provider. Once a user creates an account, Defendant retains that information along with the user's geolocation and other persistent cookies, as described in greater detail below.



[1] https://corporate.televisaunivision.com/press/press-releases/2022/01/31/univision-and-televisa-complete-transaction-to-create-televisaunivision-the-worlds-leading-spanish-language/ (last accessed February 5, 2024).
[2] https://corporate.televisaunivision.com/press/press-releases/2020/09/18/univisions-tv-portfolio-is-only-major-media-group-in-the-u-s-to-deliver-audience-growth-during-2019-2020-season/ (last accessed February 5, 2024).

*Defendant Knowingly Discloses Consumers' PII To Third Parties*

13.     Defendant uses various third-party tracking tools in order to increase knowledge of its userbase and to improve its marketing and advertising on the Website. In fact, Defendant admits that it shares data with "third-party advertising partners to show you ads that may interest you, and we may disclose information to third parties to enable targeted advertising. Some of our advertising partners are members of the Network Advertising Initiative [] or the Digital Advertising Alliance." (internal parenthesis omitted).[3] Defendant also admits that it "disclose[s] information to measurement partners such as Nielsen," and "Google Analytics to collect and process certain analytics data."[4]  Most alarmingly, Defendant also admits that (for the purposes of "cross-context behavioral advertising") it "sells" or "shares" its users "personal Information…such as name, address, and telephone number," as well as their "content browsing history, content search history, and other interactions" with the Website.[5]

14.     As relevant here, Defendant integrates Google's Analytics and DoubleClick persistent cookies "application programming interfaces" ("APIs") into its Website. Google is a company that "gets its money by tracking its users and using the data it collects to sell targeted ads to companies."[6] Google's DoubleClick software furthers that by "enable[ing] advertisers to more effectively create, manage and grow high-impact digital marketing campaigns,"[7] including by serving specific advertisements to specific users and tracking the number of views on those

---

[3] https://tv.univision.com/privacy (last accessed February 5, 2024).
[4] *Id.*
[5] *Id.*
[6] Matt Krantz, *Ask Matt: Is Google a Tech or Ad Company?*, USA TODAY (July 23, 2013), https://www.usatoday.com/story/money/columnist/krantz/2013/07/23/google-ad-company-tech/2493109/; *see generally* SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM (2019).
[7] https://support.google.com/faqs/answer/2727482?hl=en (last accessed February 5, 2024).

advertisements.

15.     Defendant also integrates software into its Website owned and operated by Innovid. Innovid is a "leading independent software platform that provides critical technology infrastructure for the creation, delivery, and measurement of TV ads across connected TV ("CTV"), mobile TV, and desktop TV environments."[8] Innovid touts its ability to identify individuals through its proprietary "Household Graph" which is designed to tie multiple devices to the same household using persistent identifiers and geolocation services.



16.     An inspection of Defendant's Website reveals that Defendant transmits information sufficient to permit these third parties, and any ordinary person who works for those third parties, to identify a specific person's video-viewing behavior.

17.     Specifically, when a user views a video on the Website, Defendant discloses to Innovid and Google via their cookies and cross-integration Google API's, a user's: (i) TV

---

[8] https://investors.innovid.com/company-information (last accessed February 5, 2024).

provider (after logging in to the Website), (ii) precise geolocation, (iii) Google and Innovid unique ID, and (iv) the video ID and category for the specific video viewed by the user.

18.     The example below demonstrates the information transmitted from Defendant's Website to Innovid:

## Video Title Disclosure to Innovid



///

///

///

///

///

///

///

///

///

**Geolocation Disclosed to Innovid**



**Precise Location Using Innovid's Geolocation Coordinates**



19.    As depicted above, Defendant discloses sufficient information to Innovid to specifically identify a user's location as well as the pre-recorded videos that they requested on Defendant's Website. This information, as well as Innovid's persistent cookies and APIs (as

discussed in ¶ 21, *infra*) permits Innovid to maintain a unique profile of the video consumption habits of visitors of Defendant's Website.

20.     Furthermore, Defendant also integrates Google's DoubleClick and Google Analytics software into its Website. The example below demonstrates the information transmitted from Defendant's Website to Google:

### **Video Title Disclosed to Google**



**Personally-Identifying Cookies sent to Google**





///

///

///

///

///

///

///

///

**Personally Identifying Cookies Sent to Google's API (Including Innovid)**



**Index of Relevant Cookies**

| Field | Value and Explanation |
|---|---|
| jid | Value: Allows Syncing of Information between Google Analytics, Google Ads, and Google Display Ads |
| | Explanation: The "jid" field equals a numeric value that is an identifier and a Join ID. This value enables Google to match a user's information that Google Analytics has obtained with information obtained through the domain Doubleclick.net (Google Display Ads). Upon information and belief, it also allows Google to match information that Google Analytics has obtained with information obtained through the domain www.Google.com (Google Ads). |
| gjid | Value: Allows Syncing of Information between Google Analytics and Google Display Ads |
| | Explanation: The "gjid" field equals a numeric value that is an identifier and Join ID. This value enables Google to match a user's information that Google Analytics has obtained with information obtained through the domains Doubleclick.net (Google Display Ads). |
| | Value: Allows Syncing of Information |

| | |
|---|---|
| cid | Explanation: According to Google, "[t]his field … identifies a particular user, device, or browser instance. For the web, this is generally stored as a first-party cookie with a two-year expiration. For mobile apps, this is randomly generated for each particular instance of an application install. The value of this field should be a random UUID (version 4) as described in http://www.ietf.org/rfc/rfc4122.txt."[9] The corresponding value is a unique alphanumeric identifier and it contains the _ga cookie value that is disguised as a "first-party" cookie by Google. |
| _Secure-3PSID | Value: Unique User Identifier linked to a Google account |
| | Explanation: Upon information and belief, this field, including similar permutations, equals a unique alphanumeric value, which is logged when a Google user is signed into their Google account (such a Gmail) and is associated with the information from that account. |
| X-Client | Value: Unique User Identifier Linked to Chrome |
| | The x-client-data header is an identifier that when combined with IP address and user-agent, uniquely identifies every individual download version of the Chrome browser. The x-client-data identifier is sent from the Chrome browser to Google every time users exchange an Internet communication, including when users log-in to their specific Google accounts, use Google services such as Google search or Google maps, and when Chrome users are neither signed-in to their Google accounts nor using any Google service. |
| IDE & SID | Value: Unique User Identifier |
| | The SID cookie is associated with a Google Display Ad (e.g., www.DoubleClick.net), and contains a value that can identify a patient's Google Account (if they have one). The IDE cookie is also associated with a Google Display Ad (e.g. www.DoubleClick.net), and it contains a value that can identify the patient's device – the specific browser instance. Thus, the SID and IDE cookies can be used to uniquely identify and track individuals as they navigate the Internet, including as they communicate with their Health Care Providers' web properties. Similar to Google Ads, Google associates the DSID and IDE cookies for specific patients and their devices to each other by acquiring them at the same time when a person is logged-in to their Google Account. Thereafter, Google's acquisition of either cookie by itself is sufficient for Google to associate any event acquired with the other cookie |

21.     As explained above, whenever a user is logged into their Gmail account or is using a Chrome browser, Google causes Defendant to send persistent cookies—such as the IDE and SID cookies—along with personally identifiable information of users logged into their

---

[9] https://developers.google.com/analytics/devguides/collection/protocol/v1/parameters (last accessed February 5, 2024).

Gmail accounts (*i.e.*, the "Secure-3" cookies) and/or Chrome accounts (*i.e.*, the "X-Client-Data"). These cookies, along with all the other cookies that Google combines from third-party sources (such as Innovid), enable Google to obtain a clear profile of an individual user as well as the specific videos requested from Defendant's Website. *See supra*, ¶ 20 at pg. 10-12.

22.     An analysis of Innovid's URL requests further discloses that the user had a unique ID ("1832080456"), and the video ad request ("como-dice-el-dicho-es-bueno-el-uso-pero-no-el-abuso") was made on an exact date and time (January 25, 2024 at 17:04:16 UTC).[10]As shown above, Innovid also assigns multiple persistent cookies to its users through Google's API. *See supra*, ¶ 20 at pg. 12.

23.     In summary, Defendant discloses information to third parties, like Innovid and Google, that would make it reasonably and foreseeably likely that Innovid and Google could identify which specific user requested or obtained which specific video from Defendant's Website.

24.     The personal information Defendant obtained from Plaintiff and the Class members is valuable data in the digital advertising-related market for consumer information. Because Defendant places advertisements alongside its pre-recorded video content and embeds commercials within its video content, Defendant is incentivized to enhance the "targeting" of such ads, allowing companies who pay Defendant to reach their "ideal" audience.

25.     At no point did Plaintiff or the Class members consent to Defendant's disclosure

---

[10]See *supra*, ¶ 18 at pg. 8:
https://dvrtr.innovid.com/v3/vast?_media=1&ctx=13042668&cmp=186201&sid=5353&plc=398
4029&advid=4283&adsrv=118&psf=0&_vast=https%3A%2F%2Frtr.innovid.com%2Fr1.65986f
cbd4edc6.41923154%3Bcb%3D%7Bs1%7D&_s1=1832080456&_api=2,7,8&_ssm=0&_tsm=1
832080456&_abm=-1&_pum=https%3A%2F%2Ftv.univision.com%2Fcategory%2Fcomo-dice-
el-dicho%3Fvideo%3Dcomo-dice-el-dicho-es-bueno-el-uso-pero-no-el-abuso

of their video viewing history to third parties. As such, Defendant deprived Plaintiff and the Class members of their privacy rights and control over their personal information.

26.     The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiff's and the Class members' personal information, including their private video viewing histories.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of himself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, logged in to Defendant's Website and viewed prerecorded content using their mobile or computer browsers.

28.     The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

29.     Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

30.     ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

31.     ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified

15

of the pendency of this action by mail and/or publication through the distribution records of

Defendant and third-party retailers and vendors.

32. ***Existence and predominance of common questions of law and fact***: Common

questions of law and fact exist as to all members of the Class and predominate over any

questions affecting only individuals of the Class. These common legal and factual questions

include, but are not limited to:

(a)     Whether Defendant collected Plaintiff's and the Class members' PII;

(b)     Whether Defendant unlawfully disclosed and continues to disclose its users' PII,

including their video viewing records, in violation of the VPPA;

(c)     Whether Defendant's disclosures were committed knowingly; and

(d)     Whether Defendant disclosed Plaintiff's and the Class members' PII without

consent.

33. ***Typicality:*** Plaintiff's claims are typical of those of the Class because Plaintiff,

like all members of the Class, watched videos on Defendant's Website and had his PII collected

and disclosed by Defendant to third parties.

34. ***Adequacy***: Plaintiff will fairly and adequately represent and protect the interests

of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an

adequate representative of the Class because he has no interests which are adverse to the interests

of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and,

to that end, Plaintiff has retained skilled and experienced counsel.

35. Moreover, the proposed Class can be maintained because it satisfy both Rule

23(a) and 23(b)(3) because questions of law or fact common to the Class predominate over any

questions affecting only individual members and a Class Action is superior to all other available

16

methods of the fair and efficient adjudication of the claims asserted in this action under Federal

Rule of Civil Procedure 23(b)(3) because:

(a)     The expense and burden of individual litigation makes it economically unfeasible

for members of the Class to seek to redress their claims other than through the procedure of a

class action;

(b)     If separate actions were brought by individual members of the Class, the resulting

duplicity of lawsuits would cause members of the Class to seek to redress their claims other than

through the procedure of a class action; and

(c)     Absent a class action, Defendant likely will retain the benefits of its wrongdoing,

and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
**Violation of the Video Privacy Protection Act
18 U.S.C. § 2710, *et seq.***

36.     Plaintiff incorporates by reference each of the allegations contained in the

foregoing paragraphs of this Complaint as though fully set forth herein.

37.     The VPPA prohibits a "video tape service provider" from knowingly disclosing

"personally-identifiable information" concerning any "consumer" to a third-party without the

"informed, written consent (including through an electronic means using the Internet) of the

consumer." 18 U.S.C. § 2710.

38.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any

person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of

prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape

service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of

delivering audiovisual materials—including the prerecorded videos that Plaintiff viewed on the Website—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

39.      As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff and the Class members are subscribers of the Website, which provides video content to users. Plaintiff and the Class members are subscribers under the VPPA because they logged into Defendant's Website and provided Defendant, at a minimum, their TV Provider, precise geolocation, and persistent cookies containing their PII, and the title or ID of the videos they viewed.

40.      Defendant knowingly caused Plaintiff's and the Class members' video viewing information, as well as the above-referenced unique identifiers, to be disclosed to third parties, including Innovid and Google. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to third parties as an individual who viewed Defendant's content, including the specific prerecorded video materials watched on the Website. This information allowed third parties, such as Innovid and Google to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

41.      As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent under this definition.

42.    Defendant was aware that the disclosures to third parties through the tracking software that it incorporated in its Website identified Plaintiff and Class members. Indeed, both Innovid and Google publicly tout their abilities to connect PII to individual user profiles. Defendant also knew that Plaintiff's and the Class members' personal viewing content was disclosed to third parties because Defendant programmed the tracking into the Website's code so that third parties would receive video titles or video IDs and the subscriber's unique third-party identifiers when a subscriber watched a prerecorded video. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Innovid and Google, among other third parties, by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

43.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's disclosures to Innovid and Google were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

44.    On behalf of himself and the Class members, Plaintiff seeks declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)     For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d)     For prejudgment interest on all amounts awarded;

(e)     For an order of restitution and all other forms of equitable monetary relief; and

(f)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: February 5, 2024                             Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC**

By:  /s/ Adrian Gucovschi
        Adrian Gucovschi, Esq.

Adrian Gucovschi
140 Broadway, Suite 4667
New York, NY 10005
Tel: (212) 884-4230
adrian@gr-firm.com

*Counsel for Plaintiff and the Class*

20